UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22-cr-314-MOC |
| | ) | |
| v. | ) | **BILL OF INFORMATION** |
| | ) | |
| | ) | Violation: |
| **CHRISTOPHER HERWIG** | ) | |
| | ) | 18 U.S.C. § 371 |

**THE UNITED STATES OF AMERICA CHARGES:**

At the specified times and at all relevant times:

<u>COUNT ONE</u>

**18 U.S.C. § 371
(Conspiracy)**

**The Defendant, Relevant Individuals, and Entities**

    1.    The Defendant, CHRISTOPHER HERWIG, a Chartered Financial Analyst, was the Chief Investment Officer and Portfolio Manager at Conglomerate 1, positions he served in at various times from in or about August 2010 to in or about August 2020. During this period, HERWIG also was employed by other entities in Conglomerate 1's family of companies, which were all controlled by an individual owner (the "OWNER"). HERWIG also served at various times as a Director/Trustee and Chief Investment Officer/Treasurer of certain of the OWNER's insurance companies, including Insurance Company 1, Insurance Company 2, Insurance Company 3, and Insurance Company 4. HERWIG also served various roles at Investment Adviser 1, which was a Malta-based investment adviser that was registered with the United States Securities and Exchange Commission.

    2.    In these roles, HERWIG supervised and directed other employees, including DEVIN SOLOW ("SOLOW") (charged elsewhere). SOLOW was hired by OWNER in or about December 2013, as a Mergers & Acquisitions Associate at Conglomerate 1. At various times, SOLOW also had been employed in assorted roles by other OWNER-controlled entities within Conglomerate 1's family of companies, including as Vice President of Investments.

    3.    OWNER was the ultimate controlling party with ultimate financial control and interest over multiple insurance companies, dozens of operating companies, and more than a hundred holding and pass-through entities. One of OWNER's holding companies, Insurance

Holding Company 1, was the holding company for OWNER's North Carolina-based insurance companies, including Insurance Company 1, Insurance Company 2, and Insurance Company 3. OWNER also owned several insurance companies based in Bermuda, including Insurance Company 4. During certain relevant periods, OWNER was on the board of OWNER's insurance companies and was a director of Investment Adviser 1.

4. Third Party Life Insurance Company 1 was an insurance company with its principal place of business in Puerto Rico. Nearly all of Insurance Company 4's business was related to a reinsurance agreement it entered into on or about June 30, 2017, with Third Party Life Insurance Company 1. As part of the Reinsurance Agreement between Insurance Company 4 and Third Party Life Insurance Company 1, Insurance Company 4 established a Third Party Life Insurance Company 1 2017 Trust (the "Third Party Life Insurance Company 1 2017 Trust") and a separate Comfort Trust Account (the "Third Party Life Insurance Company 1 Comfort Trust") both of which for "the sole use and benefit of Third Party Life Insurance Company 1." The Reinsurance Agreement between Insurance Company 4 and Third Party Life Insurance Company 1 also set forth numerous requirements governing the types of investments that could be made in the Third Party Life Insurance Company 1 2017 Trust and the Comfort Trust and the periodic reporting and certification to be made by Insurance Company 4 to Third Party Life Insurance Company 1 concerning the assets in these accounts.

## The Conspiracy

5. From in or about January 2016 through at least 2019, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

## CHRISTOPHER HERWIG

did willfully combine, conspire, confederate, and agree with others known and unknown to the United States of America, including OWNER and SOLOW, to commit offenses against the United States, including violations of Title 18, United States Code, Sections 1033 and 1343, 1956, and 1957 and Title 15, United States Code, Sections 80b-6 and 80b-17.

## Objects of the Conspiracy

6. ***Crimes in connection with Insurance Business.*** It was a part and an object of the conspiracy that the Defendant, OWNER, SOLOW, and others known and unknown, while engaged in the business of insurance and whose activities affected interstate commerce, and while acting as, or being, an officer, director, agent, or employee of such a person engaged in the business of insurance, and while being involved (other than as an insured or beneficiary under a policy of insurance) in a transaction relating to the conduct of affairs of such a business of insurance would and did:

    a. knowingly, with the intent to deceive, make any false material statement or report and willfully and materially overvalue any land, property, or security, in connection with any financial reports or documents presented to any insurance regulatory official or agency, and an agent or examiner appointed by such official

2

or agency to examine the affairs of such person, for the purpose of influencing the actions of such official or agency and such an appointed agent or examiner;

b. willfully embezzle, abstract, purloin, and misappropriate any of the moneys, funds, premiums, credits, and other property of such person so engaged in the business of insurance; and

c. knowingly make a false entry of material fact in a book, report and statement of such person engaged in the business of insurance with the intent to deceive any person, including any officer, employee, or agent of such person engaged in the business of insurance, any insurance regulatory official or agency, or any agent or examiner appointed by such official or agency to examine the affairs of such person, about the financial condition or solvency of such business, in violation of Title 18, United States Code, Section 1033.

7. ***Wire Fraud.*** It was a part and an object of the conspiracy that the Defendant, OWNER, SOLOW, and others known and unknown, having devised a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, for the purpose of executing and attempting to execute the scheme and artifice, would and did cause to be transmitted by means of wire communications in interstate commerce any writing, signal, or sound, in that, among other things, defendants sent and caused to be sent electronic communications and electronic financial transactions in interstate commerce, in violation of Title 18, United States Code Section 1343.

8. ***Money Laundering.*** It was a part and an object of the conspiracy that the Defendant, OWNER, SOLOW, and others known and unknown would and did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, with the intent to (a) promote the carrying on of specified unlawful activity, and (b) conceal and disguise in whole and in part the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

9. ***Transactional Money Laundering.*** It was a part and an object of the conspiracy that the Defendant, OWNER, SOLOW, and others known and unknown would and did engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity—to wit, wire fraud—in violation of Title 18, United States Code Section 1957.

10. ***Investment Adviser Fraud.*** It was a part and an object of the conspiracy that the Defendant, OWNER, SOLOW, and others known and unknown willfully and knowingly, would and did cause an investment adviser to use the mails and other means and instrumentalities of interstate commerce, directly and indirectly, (a) to employ a device, scheme, and artifice to defraud clients and prospective clients; (b) to engage in a transaction, practice, and course of business which operated as a fraud and deceit upon clients and prospective clients; and (c) to engage in an

3

act, practice, and course of business which was fraudulent, deceptive, and manipulative, in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

## Purposes of the Conspiracy

11.     The purposes of the conspiracy were to deceive and defraud the North Carolina Department of Insurance ("NCDOI"), various ratings agencies, Third Party Life Insurance Company 1, and ultimately insurance policyholders and others, evade regulatory requirements meant to protect policyholders, conceal the true financial condition of OWNER's insurance companies, and conceal OWNER's true use of insurance company funds for OWNER's benefit.

## Manner and Means of the Conspiracy

12.     As part of the manner and means of the conspiracy, OWNER, HERWIG, and SOLOW engaged in circular transactions among OWNER's web of entities using insurance company funds, and made, and caused to be made, various false and fraudulent representations, concealed material facts, and told deceptive half-truths to the NCDOI and other third parties regarding these transactions.

13.     For example, as part of the conspiracy and in furtherance of its purposes:

   a.     In December 2015 and January 2016, contrary to representations OWNER caused to be made to the NCDOI, OWNER, HERWIG, and SOLOW, caused OWNER's insurance companies, Insurance Company 1 and Insurance Company 2 to fund Insurance Holding Company 1's purchase of Insurance Company 2 from Insurance Company 1. To conceal this, OWNER, HERWIG, and SOLOW utilized a complicated set of inter-company transactions, including approximately $46 million in loans from Insurance Company 2 and Insurance Company 1 that were funneled directly and indirectly to Insurance Holding Company 1, which were designed to circumvent insurance regulations. Moreover, OWNER directed the making of various materially false and misleading entries in the books, reports, and statements of Insurance Company 1, Insurance Company 2, and Insurance Holding Company 1, with the intent to deceive the NCDOI and others regarding the financial condition of those entities.

   b.     Throughout 2017 and 2018, OWNER, HERWIG, and SOLOW extracted hundreds of millions of dollars from various insurance companies through a series of loans and related financial transactions to fund the acquisition and operation of other OWNER companies. This included "skimming" approximately $55 million from insurance companies while repackaging certain of the insurance companies' existing investments into new structured investments referred to as "FinCos," which OWNER, HERWIG, and SOLOW falsely represented to NCDOI and others were unaffiliated investments managed by a third-party that would benefit the insurance companies. In addition, at OWNER's direction, HERWIG and SOLOW caused certain FinCos, which were capitalized with loans from OWNER's insurance companies, to fund and refinance millions of dollars in residential real estate purchases by OWNER.

c. In late December 2017, OWNER, HERWIG, and SOLOW caused Insurance Company 4 to engage in a series of sham repurchase transactions ("Repos") with various entities affiliated with OWNER totaling nearly $96 million. The coconspirators executed these Repos to, among other things, artificially inflate the capital position of Insurance Company 4 as of year-end 2017. This inflated capital position caused various materially false entries in the books, reports, and statements of Insurance Company 4, and deceived regulators, Third Party Life Insurance Company 1, and others regarding the financial condition of Insurance Company 4.

d. In January 2018, OWNER, HERWIG, and SOLOW fraudulently extracted nearly $200 million from Insurance Company 2 and the Third Party Life Insurance Company 1 2017 Trust to amass "show money" in connection with OWNER's planned acquisition of another large insurance company, again utilizing sham Repos. The coconspirators also fraudulently extracted another $55 million from the Third Party Life Insurance Company 1 2017 Trust, again utilizing sham Repos, which were used to: (1) further artificially inflate the capital position of Insurance Company 4; (2) fund OWNER's extravagant lifestyle; and (3) make payments on loans that OWNER's affiliated companies owed to insurance companies. Notwithstanding that these Repos were structured as short-term 90-day transactions, they were not intended to be, and were not in fact, repaid within 90 days. Rather, they were "renewed" or "rolled over" multiple times and remained outstanding through at least on or about March 31, 2019. Nevertheless, OWNER and HERWIG caused various materially false entries in the books, reports, and statements of Insurance Company 4 by recording the Repos as "cash equivalents" in order to deceive Third Party Life Insurance Company 1 regarding Insurance Company 4's compliance with the investment restrictions governing the Third Party Life Insurance Company 1 2017 Trust, which were put in place to protect Third Party Life Insurance Company 1's policyholders.

e. OWNER caused OWNER's insurance companies to, directly and indirectly, enter into investment advisory service agreements with Investment Adviser 1. Although Investment Adviser 1, OWNER, and others owed fiduciary duties to OWNER's insurance companies, OWNER, HERWIG, and SOLOW frequently put the interests of OWNER and certain of OWNER's other entities ahead of OWNER's insurance companies while also failing to disclose material information to the executives running those insurance companies. For example, at OWNER's direction, HERWIG caused the Third Party Life Insurance Company 1 2017 Trust to purchase mortgages and holding companies for OWNER's personal real estate, without disclosing such information to Third Party Life Insurance Company 1. Moreover, OWNER, HERWIG, and SOLOW used Investment Adviser 1 to extract millions of dollars from OWNER's insurance companies in the form of investment advisory fees paid to Investment Adviser 1, which they then "loaned" to other of OWNER's affiliated companies.

f. OWNER, HERWIG, and SOLOW caused various insurance companies owned by OWNER to invest in more than $2 billion in loans and other securities with other entities affiliated with OWNER. As of June 30, 2022, OWNER's North Carolina insurance companies still held over $1 billion in investments in other entities affiliated with OWNER,

and OWNER's offshore insurance companies still held over $900 million in investments in other entities affiliated with OWNER.

  g. While publicly representing he/she never took a "dividend" from an insurance company, OWNER instead used loans to extract money from the insurance companies for OWNER's personal benefit indirectly, including through transfers (a) documented as "loans to shareholder" or (b) using a series of loans through multiple pass-through entities before ultimately living out of the accounts of some of those pass-through affiliated entities, including Pass-Through Entity 1 and Pass-Through Entity 2. On multiple occasions in late 2018, OWNER signed "Loan Forgiveness Agreements" on behalf of various entities, forgiving more than $125 million in such loans.

  14. Also as part of the conspiracy and in furtherance of its purposes, OWNER, HERWIG, and SOLOW made, and caused to be made, various other false and fraudulent representations, concealed material facts, and told deceptive half-truths. For example, HERWIG made, and caused to be made, various materially false and misleading statements to regulators at the NCDOI and to other third parties concerning the purported independence of the FinCos, including that OWNER would "have no control" over the entities and that the entities would be managed by an independent portfolio manager. In truth and fact, OWNER did have control over the FinCos and HERWIG and SOLOW effectively served as the portfolio managers for the FinCos.

  15. This financial fraud scheme ultimately caused substantial financial hardship to OWNER's insurance companies, to third parties like Third Party Life Insurance Company 1, and to more than 50,000 policyholders who, as of June 30, 2022, were collectively owed, among other things, more than $643 million in principal and interest on annuities. As a result, certain of OWNER's insurance companies were placed in Rehabilitation and Insurance Company 4 was placed into liquidation:

  a. On or about June 27, 2019, Insurance Company 1, Insurance Company 2 and Insurance Company 3 consented to an Order of Rehabilitation, pursuant to a petition filed by the NCDOI, who "took action after determining that the long-term liquidity of the investment portfolios of the Companies had deteriorated to the point that [NCDOI] needed to act to protect the policyholders of the Companies."

  b. In September 2020, the Bermuda Monetary Authority ("BMA") petitioned for Insurance Company 4 and other Bermudian insurance companies owned by OWNER to be placed into liquidation due to those companies' inability to pay their debts, their failure to make required regulatory filings, and the BMA's concern that "the asset values of the Company's investments held in affiliated companies may be overvalued." On or about September 25, 2020, a Court in Bermuda placed Insurance Company 4 and the other Bermudian companies into liquidation and appointed Joint Provisional Liquidators for the companies.

6

Case 3:22-cr-00314-MOC-SCR Document 3 Filed 12/19/22 Page 6 of 9

## Overt Acts

16. In furtherance of the conspiracy, and to accomplish the objects thereof, the Defendant and his co-conspirators committed one or more of the overt acts in the Western District of North Carolina and elsewhere, including the following:

    a. On or about January 28 and 29, 2016, OWNER, HERWIG, and SOLOW caused numerous wire transfers to be executed, which funneled more than $36 million from Insurance Company 1 and Insurance Company 2 to Insurance Holdings Company 1 so that Insurance Holdings Company 1 could pay for its purchase of Insurance Company 2 from Insurance Company 1 that had purportedly closed on December 31, 2015.

    b. On or about January 10, 2017, HERWIG wrote to NCDOI, copying OWNER and SOLOW, explaining a proposed unaffiliated FinCo investment structure. In his letter, HERWIG represented, *inter alia:* (1) The FinCo "will have a contracted third party employee managing decisions and executing on behalf of the trustee;" that employee "has decades of experience in the middle market lending industry;" and that employee "will have the ability to buy and sell loans in order to generate income that will pay back the loan" to the FinCo; and (2) OWNER "will have no control over" the FinCo.

    c. On or about March 29, 2018, OWNER and SOLOW caused a FinCo funded with insurance company money to fund a mortgage for the purchase of various real properties located around one of OWNER's homes in Chapel Hill, North Carolina ("Tennis Facility Properties").

    d. On or about July 2, 2018, OWNER and SOLOW caused a FinCo funded with insurance company money to fund a mortgage for the purchase of a mansion for OWNER on Morning Mountain Road in Raleigh, North Carolina ("Morning Mountain Property").

    e. On or about October 31 and December 20, 2018, OWNER signed a series of Loan Forgiveness Agreements, which forgave the numerous loans from Affiliated Companies to Pass-Through Entity 1, totaling more than $125 million.

    f. On or about December 17, 2018, HERWIG falsely represented to Third Party Life Insurance Company 1 that "[a]ll investments identified as cash [in the Third Party Life Insurance Company 1 2017 Trust] meet the definition of cash in Chapter 6, which is 'investments or stocks with a maturity term of 90 days or less.'" HERWIG further misleadingly represented to Third Party Life Insurance Company 1 that "[n]one of the assets in the trust fit the definition of affiliated as noted in chapter 6 which defines affiliates as being under common control."

    g. On or about December 28, 2018, OWNER, HERWIG, and SOLOW caused the approximately $3.37 million mortgage on OWNER's Morning Mountain Property to be purchased by the Third Party Life Insurance Company 1 2017 Trust.

h. Also, on or about March 6, 2019, OWNER and HERWIG caused the approximately $3.1 million mortgage on OWNER's Tennis Facility Properties to be purchased by the Third Party Life Insurance Company 1 2017 Trust.

i. On or about March 13, 2019, OWNER directed HERWIG to cause the Third Party Life Insurance Company 1 2017 Trust to purchase the purported "equity" in the entities holding the Morning Mountain Property and the Tennis Facility Properties for a total of nearly $3.6 million.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF FORFEITURE

17. Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

   a. All property which constitutes or is derived from proceeds of the violation set forth in this Bill of Information; and

   b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

18. The United States of America alleges that the following property is subject to forfeiture on one or more of the grounds stated above:

- A forfeiture money judgment in the amount in amount to be determined, such amount constituting the proceeds of the violation(s) set forth in this Bill of Information

DENA J. KING
UNITED STATES ATTORNEY

DANIEL RYAN
ASSISTANT UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
CRIMINAL DIVISION, FRAUD SECTION

LYNDIE FREEMAN
TRIAL ATTORNEY, CRIMINAL DIVISION, FRAUD SECTION